# United States District Court

SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

V.

Charles Llewylin, Douglas McCloud, Christopher Gilbourne, Edward Daley Dorrel Bryan and Howard Beckford

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 00-4006-SNOW

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On <u>January 14, 2000,</u> in Broward County, in the <u>Southern</u> District of <u>Florida</u>, the defendants did, (Track Statutory Language of Offense) **combine, conspire, confederate and agree to possess with the intent to distribute cocaine, a Schedule II controlled substance,**

in violation of Title <u>21</u> United States Code, Sections <u>841(a)(1) and 846</u>

I further state that I am a Task Force Officer, and that this complaint is based on the following

See Attached Affidavit

Continued on the attached and made a part hereof:   [x] Yes   [ ] No

_____
James Barnick, Task Force Officer

Sworn to before me, and subscribed in my presence,

<u>January 15, 2000</u>                    at  <u>Fort Lauderdale, Florida</u>
Date                                         City and State

<u>Lurana S. Snow, Chief United States Magistrate Judge</u>    _Lurana S. Snow_
Name and Title of Judicial Officer                           Signature of Judicial Officer

## AFFIDAVIT

I, JAMES BARNICK, BEING SWORN, HEREBY DEPOSE AND SAY:

1. I am a detective with the Hollywood, Florida Police Department and have been so employed for since 1993. I have been assigned to the vice, intelligence and narcotics unit since March of 1998. During that time I have investigated narcotics cases involving violations of both the State of Florida and Federal narcotics laws. I have also participated in numerous search and arrest warrants involving narcotics and money laundering. Since January of 2000, I have been assigned as a Task Force Officer (TFO) with the United States Department of Justice, Drug Enforcement Administration (DEA) in the Miami Field Division, Fort Lauderdale, Florida District Office.

2. The information contained in this affidavit was obtained directly from your affiant as well as information provided by other TFO's and Special Agents of the Drug Enforcement Administration, state and local law enforcement officers, and information provided by confidential sources of information. This affidavit is intended to serve as a summary of the following investigation and does not include each and every detail.

3. On January 13, 2000, a DEA confidential source (CS) telephonically contacted an individual in Jamaica known as "Bravo" for the purpose of setting up a cocaine deal. Bravo was known to the CS as a person who was involved in buying and selling cocaine, and the CS represented to Bravo that the CS had a source for cocaine in South Florida. Bravo supplied the CS with the phone number of a person in South Florida who was interested in purchasing multi-kilograms of cocaine.

4. The CS then called the number and spoke to an individual who was later identified as CHARLES LLEWYLN. In a series of telephone conversations, 12 of which were tape recorded,

LLEWYLN indicated that he was interested in purchasing a quantity of cocaine from the CS, who said he had 28 kilos available. LLEWYLN wanted to inspect the merchandise before committing himself to a specific amount.

5. On January 14, 2000, the CS returned a page from LLEWYLN and negotiated a meeting that afternoon between the CS and LLEWYLN at a specified location at the Sawgrass Mills, Sunrise, Florida. At approximately 3:40 PM, LLEWYLN arrived at the agreed upon location in a Toyota Celica driven by a second individual, DOUGLAS MCCLOUD. During that meeting, the CS advised that he was willing to furnish them 6 kilos, four of which they would pay for in cash at $17,000 a kilo- and two kilos which would be "fronted". LLEWYLN advised that he had some people waiting that had cash available to purchase 5 kilos. LLEWYLN asked whether, if he were able to pay for 5 kilos, could he be fronted 3 kilos instead of 2. The CS agreed this could be done, as long as the CS could see the money. MCCLOUD participated in the conversation and affirmed statements made by LLEWYLN. MCCLOUD then placed a call on his cell phone, telling the other party that "he's here, he's for real and you can bring everything". MCCLOUD then gave that other party directions to meet them at Sawgrass. After the call, MCCLOUD informed the CS that the buyers had already purchased one kilo elsewhere.

6. Approximately 50 minutes later, a grey Ford Windstar minivan pulled up. The van was occupied by four individuals, Christopher Ostor GILBOURNE, Howard Neal BECKFORD, Dorrel Tony BRYAN, and Edward Joe DANY. The driver was GILBOURNE. BECKFORD was in the front passenger seat, and BRYAN and DANY were in the back seat. MCCLOUD went over to the van and spoke with GILBOURNE. MCCLOUD advised the CS that they had $85,000 (for 5 kilos). GILBOURNE then got out of the vehicle and met with the CS and MCCLOUD. In initial conversations, GILBOURNE indicated that he wanted to test the

merchandise. The CS indicated that the CS wanted to see the money first. The parties agreed and MCCLOUD told the CS to go over to the van. GILBOURNE then returned to the van and got back into the driver seat. The CS walked over to the rear passenger door, which was open. The CS observed a cardboard box on the floor between the two rear passengers. DANY opened the flap to the box so that the CS could look inside. Inside was a black duffel bag, containing a rectangular tape wrapped package on top, which DANY moved aside upon the request of the CS. CS then observed piles of United States currency in the box, consistent with the $85,000 figure. When the CS tried to lean into the van for a closer look, BRYAN blocked his access and told him to "just look, just look. We're for real, Bro". After observing the money, the CS, MCCLOUD, GILBOURNE and LLEWELYN discussed who was going to accompany the CS to see and test the cocaine. It was finally agreed that MCCLOUD would accompany the CS in the CS's vehicle.

7. The CS then drove MCCLOUD to a predetermined location, which was the parking lot of an apartment complex located about one half mile from Sawgrass Mills. LLEWYN followed the CS and MCCLOUD in the Toyota Celica. Upon arriving at this location, TFA Gene Lewis, acting in an undercover capacity, produced one kilogram of cocaine, wrapped in yellow tape, and gave it to MCCLOUD. MCCLOUD handled the kilo and, without testing the package, expressed satisfaction with it. At this time, both MCCLOUD and LLEWYLN were taken into custody by agents.

8. Subsequent to the above arrests, BECKFORD, DANY, GILBOURNE and BRYAN were arrested while circling the area around the mall in the aforementioned minivan. It had been agreed that they would meet back at the original meeting location to make the transfer of cocaine for United States Currency. Upon their arrest, one kilogram of suspected cocaine and

an undetermined amount of United States Currency were recovered in the van.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
James Barnick, Task Force Officer
Drug Enforcement Administration

SWORN AND SUBSCRIBED TO
before me this 15th day of January, 2000.

_____
LURANA S. SNOW
CHIEF UNITED STATES MAGISTRATE JUDGE